United States District Court
Western District of Tennessee

United States of America
Plaintiff

v.

Brian McMackin
Defendant, Pro Se

Case Number
2:09-CR-20202-01

Exigent and Emergent
Motion for Reduction in Sentence
Under 18 U.S.C. § 3582 as amended by
the FIRST STEP ACT of 2018 and the
CARES ACT of 2020

Brian McMackin seeks a reduction in sentence (RIS) under the authority provided by the FIRST STEP ACT, or to be assigned home-confinement under the provisions of the CARES ACT, in light of the pandemic emergency involving the spread of the COVID-19 virus.

**Exhaustion Requirement**

McMackin has exhausted the notification requirement to the prison, and the prison's Warden, pursuant to the standards set forth under the FIRST STEP ACT and the CARES ACT.

**Legal Authority**

Attorney General Barr's 3rd memorandum (April 6, 2020) addressed the need for the Bureau of Prisons to utilize the Risk Assessment System (7/19/19) in conjunction with the FIRST STEP ACT of 2018 (P.L. 115-391) and the CARES ACT

of 2020 to increase the use of home-confinement at Institutions affected by the COVID-19 pandemic.

A. The FIRST STEP ACT of 2018 amended 18 U.S.C. § 3582 in order to modify the previous ways an inmate can seek compassionate release. In section 603 of the Act, Congress amended § 3582(c)(1)(A) to permit defendants to move a sentencing court for modification of sentence "after the defendant has fully exhausted all administrative right to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the Warden of the defendant's facility, whichever is earlier." See U.S.C. § 3582 (c)(1)(A).

Section 3582 (c)(1)(A) provides in part:

> The court...may reduce the term of imprisonment and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment, after considering the factors set forth in section 3553(a) to the extent that they are applicable if it finds that-
>
> (i) extraordinary and compelling reasons warrant such a reduction...and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

United States Sentencing Guidelines section 1B1.13 and related commentary from the Sentencing Commission were most recently updated on November 1, 2018 before the effective date of the FIRST STEP ACT on December 21, 2018. Accordingly, the guideline and commentary still presume that a reduction in sentence (RIS) under § 3582 must be made upon motion of the Director of the Bureau of Prisons.

The commentary describes certain circumstances under which "extraordinary and compelling reasons" for a reduction exists. But, the commentary does not suggest that the list is exclusive. Application Note 1(D), titled "other reasons"

is a "catch-all" provision, noting that the Director may determine "there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." App. Note 3 states that "rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purpose of this policy statement," mirroring that language of 28 U.S.C. 994. In Application Note 1, thereby allowing a court to consider 3553(a) factors, as well as whether or not the defendant is a danger to the safety of any other person or to the community when determining if a reduction in sentence is warranted. Some courts have concluded that the Commission's failure to amend guideline 1B1.13 and related commentary following the FIRST STEP ACT does not preclude a court from acting on motions for RIS applying the "catch-all" provision in Application Note 1(D).

B.. The CARES ACT of 3/26/20 grants authority to the Attorney General to take alternative decisive action regarding the placement of prisoners in home confinement. This provision is expouded upon in section 12003(b)(2) and amends 18 U.S.C. § 3624(c)(1) and (2) to grant immediate home-confinement for up to 30 days after this national emergency declaration terminates (see COVID-19 declaration).

The defendant's Case Manager has authority to render an eligibility determination based, in part, from the prison's Assessment of Prisoner Risks. The home-confinement provision offsets emergency conditions which materially affect the functioning of the Bureau of Prisons and which serves a tool for combatting the dangers that COVID-19 poses to vulnerable inmates.

Some factors for consideration in granting relief include: age and vulnerability of the prisoner to COVID-19, if the prisoner is classified Low or Minimum, inmate conduct in prison (i.e. free from violence and gang activity), PATTERN score, crime of conviction, and Re-Entry plan.

Issue

The Bureau of Prisons is utterly unprepared and unequipped to protect the health and safety of those in its custody against this terminal threat. Personal Protective Equipment (PPE) issue for inmates are non-existent, overcrowding forces prisoners to remain in close proximity to one another, and medical care is scant. Only those prisoners in advanced stages of COVID-19 ever see medical staff, and off-site medical facilities are already taxed with patients, rendering their assistance to prisoners unsubstantial, if at all.

The collective effect of these factors has resulted in a custodial petri dish of COVID-19 growth within the prison which exponentially increases the likelihood of prisoners contracting the viral condition and subjecting them to a foreseeable death under the BOP's lack of custodial ability to deal with this pandemic.

Background

Approximately 6 months ago, the world received notice that a life-threatening pandemic under COVID-19 was imminent. Humans everywhere, unprepared and unprotected, were killed by the virus. As the virus proliferated in the United States, our nation experienced extreme and severe measures to protect its citizens from contracting this deadly virus.

Businesses closed, social distancing was implemented, personal protective equipment (PPE) became essential, and sanitary and medical services became an indispensable part of our nation's protective regime.

Despite the alarming rate and efficiency by which COVID-19 spreads, it has found its way into the Federal Prison system and has affected the inmate population en masse.

Discussion

The physical presence of the COVID-19 virus at FCI Forrest City Low is evinced by the 264 cases (as of 5/5/20) among inmates and dozens of staff members ill with the virus. Also, the CDC has taken residency in the center of the prison's compound having erected M.A.S.H.-style medical tents which are equipped with electrical generators, HVAC tubing connecting the tents together, and have been fabricated with plywood flooring throughout.

It is obvious that these semi-permanent constructions are here for a lengthy time in an effort to control this crisis.

Inmates have been subjected to an ever-increasing litany of imposed restrictions and confinement under conditions set forth by the BOP's reaction to the spread of COVID-19 contamination from within the unit. Guards and staff routinely wear N-95 masks, protective Tyvek medical smocks, latex gloves, eye-protection goggles and carry a bottle of hand sanitizer on their utility belts. This equipment is maintained throughout their shift for their personal protection against COVID-19.

Additionally, the prison has limited providing soap and other personal hygiene supplies to its prisoners even if they are indigent. This practice not only impedes one's own ability to acquire washing materials, but subjects the population to a mass of unwashed bodies for lack of accessibility to rationed soap and toothpaste.

Access to the prison's commissary has been severely restricted as of 3/31/20. The current prison regime has created a practice where prisoner's sentences are executed under cruel and unusual standards, contravening the previous practices of providing reasonable standards of safety which do not jeopardize their health and safety to minute-by-minute exposure to the deadly COVID-19 virus. In fact, Congress has provided this court with a valuable resource with which to resolve this issue. Through the CARES ACT, this court may order to the BOP to secure prisoners

under home-confinement until such time as this pandemic has abated. District Courts and Circuits across the nation have found merit to this resolution and, as of this writing, there appear approximately several dozens of cases which have been granted this relief (case citations omitted).

B.O.P. Home-confinement Criteria

There exists an additional constitutional issue to consider in this matter in that "[w]hen a person is taken into custody, who by reason of the deprivation of his liberty cannot care for himself, the Constitution imposes upon the [State] a corresponding duty, to assume responsibility for the prisoner's safety and well being." This includes prison conditions which do not pose unreasonable threats, or risk to health and safety to the prisoners in detention. (U.S. Constitution 8th Amendment).

At FCI Forrest City-Low, this issue is prevalent.

The prison administration at FCI Forrest City-Low currently uses a 7-criteria matrix for determining eligibility for home-confinement. They are:

- Minimum risk score
- No incident reports in the last 12 months
- No history of violence
- No gang activity in prison
- Not a sex offender
- Is a United States citizen
- Has an established home plan

(See Unit Manager A. Parks' memorandum of 4/10/20 titled "4-09-2020 town hall/follow up") wherein it references "Attorney General Barr's memo" dated 26 Mar. 2020. These criteria, however, were changed and broadened the ranks of eligible inmates. In A.G. Barr's updated memo of April 6, 2020, and information taken from his BOP Regional Office staff report, he has criticized the risk-assessment tools used by the BOP as potentially unconstitutional. Instead, Barr narrows his criteria to exclude those inmates who are "heinous": violent gang members or child predators whose circumstances must be weighed against the potential risk of the prisoner's exposure to COVID-19.

This memorandum declared the need to "increase the use of home-confinement at Institutions most affected by COVID-19...as a tool for combatting the dangers COVID-19 poses to our vulnerable inmates."

Under the COVID-19 crisis, the BOP is unable to maintain regular confinement as the term is regularly understood. Instead, the excessive restrictions, unsafe exposure to infected prisoners in an open dorm setting and a categorical disregard for at-risk prisoners who are summarily denied inclusion in the home-confinement program, because of their non-death sentence but politically offensive crime - are unconstitutional. This is so because of the now new form of punishment which is significantly harsher than longstanding prior practices of incarceration without exposure to highly contagious, deadly forms of disease.

Since this pandemic is both novel and unprecedented, there is no precedent that can be found that falls squarely on this pandemic issue. However, the basic precepts of Farmer v. Brennan 511 U.S. 835 apply where "the official knows of and disregards an excessive risk to inmate health and safety...". While incarcerated under current standards, prisoners remain at high risk from multiple sources internally and from personnel who are transient between home and work. The Prison is aware of the many vulnerabilities present, yet is unable to provide safety absent tortuous

isolation assignment in the already overcrowded SHU. The open dorm cubicles which house the prisoners at FCI Forrest City-Low offer no protection from the contagious conveyances of the virus.

Despite the hundreds of prisoners that have contracted the virus, the prison maintains the same conditions despite these repeated examples. The systematic and gross deficiencies in staffing, facilities, equipment, and procedures remain life threatening despite prison official's motives.

The degree of crowding and exposure to sick prisoners will undoubtedly adversely resolve this issue unless this court offers prompt, preventative intervention. Additional authority exists pursuant to 18 U.S.C. § 3626(a)(3), but release, or RIS, is not necessarily being sought, but includes a request for reassignment to a temporary home-confinement setting for the duration of this event. RIS is an additional, optional remedy under the FIRST STEP ACT's "extraordinary and compelling" provision.

## Home Plan

McMackin maintains strong familial ties which afford him ample support in both his housing and financial resources. He is free from any serious prison disciplinary issues and is violence and gang free. He has used his time wisely while in detention, completing numerous educational courses and vocational training.

McMackin has readily available housing and plans to reside with his father in Humboldt, Tennessee. While at home, McMackin plans to continue his education by taking correspondence school courses in business management and ultimately work towards accomplishing a college degree. He is fully financially supported but wishes to enter the work force, with this court's approval, as a clerk or warehouse manager and hopes to volunteer his free time with the local Humane society by assisting in preparing lost/abandoned animals for pet adoption.

## Conclusion

McMackin has demonstrated that he is no longer safe in the prison/custodial detention setting. If he were to be assigned electronic-monitoring, under this court's custody and jurisdiction, he could practice effective social distancing, have access to emergency health care in the event of serious need, and would stand a likely chance of surviving this pandemic. As it stands, McMackin has no chance and will likely succumb to the exposure of this virus under his current, debilitated state, combined with the BOP's inability to provide for his current care, health and safety, or protection.

McMackin prays this court find merit to his claim and grants him temporary reassignment to electronic-monitoring and RIS until such time as this crisis has abated or permanently relieved of his remaining sentence as this court deems proper and just under the circumstances.

## Verification

I have read the foregoing Exigent and Emergent Motion and hereby verify that the matters alleged herein are true, except as to matters alleged on information and belief, and as to those, I believe them to be true and correct. Executed at Forrest City, Arkansas on this 7th day of December, 2020.

/s/Brian McMackin
Brian McMackin
Defendant, Pro Se

## Certificate of Service

I certify under the penalty of perjury that the foregoing Exigent and Emergent Motion was placed in the prison's internal mail system, postage pre-paid, for service upon this court via U.S. mail on this 7th Day of December to 167 North Main Street room 242 Memphis, Tennessee 38103. McMackin asks this courts clerk to serve all other interested parties by electronic notification and to provide him with a stamped filed copy of this motion.

/s/Brian McMackin
Brian McMackin
Defendant, Pro Se